## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1-21-cv-00373-RMR-NRN

NORTHGAUGE HEALTHCARE ADVISORS, LLC,

Plaintiff,

v.

CONSTELLATION, INC., a Minnesota Corporation; and
MEDPLACE, INC. f/k/a HOOT MEDICAL, INC., a Delaware Corporation,

Defendants.

---

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

---

This case stems from the breakdown of a once promising business relationship between two companies operating in the healthcare consulting and medical professional liability insurance industries. In 2016, Plaintiff NorthGauge Healthcare Advisors, LLC ("NorthGauge") and Defendant Constellation, Inc. ("Constellation") began working together under a Professional Services Agreement ("PSA"). Pursuant to the PSA, NorthGauge assisted Constellation with its early claims review, which is a process used in the medical professional liability insurance industry to assess potential claims made by injured patients against medical providers.

After three years of successfully working together, NorthGauge and Constellation started exploring the possibility of expanding their existing business relationship. While the parties were negotiating this possibility, Constellation's internal Innovation Team separately began developing Defendant Medplace, Inc. f/k/a Hoot Medical, Inc.

("Medplace")[1]. Medplace was formed by Constellation to operate a digital platform providing numerous services, including early claims review. In November 2020, when NorthGauge learned of Medplace's existence, NorthGauge immediately suspended services to Constellation. This lawsuit followed.

On February 5, 2021, NorthGauge filed the instant action alleging that Constellation and Medplace wrongfully misappropriated confidential information and trade secrets in order to develop a competing business. NorthGauge further alleged that confidential information was improperly disclosed by Constellation under the parties' NDA. At the time of trial, the following claims remained: breach of contract against Constellation for breaches of the PSA and NDA; violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, *et seq.*, against Constellation and Medplace; violation of the Colorado Uniform Trade Secrets Act, C.R.S. §§ 7-74-101, *et seq.*, against Constellation and Medplace; and unjust enrichment against Medplace.[2] Prior to trial, the Court ruled that NorthGauge's unjust enrichment claim is an equitable remedy that would be tried to the Court. *See* ECF No. 112.

The Court presided over a seven-day jury trial on August 21-29, 2023. The unjust enrichment claim was tried to the Court at the same time. At the close of all evidence, NorthGauge voluntarily dismissed its claim for breach of the PSA. The jury returned a special verdict form, based on which it found for Defendants on breach of contract under the NDA, violation of the Defend Trade Secrets Act, and violation of the Colorado Uniform

---

[1] During the relevant time period, Medplace initially operated as "Hoot" and then changed its name to Medplace. For consistency, the Court will refer to the company as Medplace throughout its Order.

[2] Prior to trial, the Court dismissed NorthGauge's misappropriation of business value claim and its unjust enrichment claim against Constellation. See ECF No. 63.

Trade Secrets Act. Thus, the sole issue before the Court is whether NorthGauge is entitled to any relief, in equity, for its unjust enrichment claim against Medplace.

Having carefully considered the evidence presented at trial, the applicable law, and all matters of record, and being fully advised in the premises, the Court issues the following Findings of Fact and Conclusions of Law regarding the unjust enrichment claim pursuant to Fed. R. Civ. P. 52(a).

## I.     FINDINGS OF FACT

### A.     The Parties

1. NorthGauge is a Colorado corporation with its principal place of business in Englewood, Colorado. ECF No. 92 at 24.

2. Constellation is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. *Id.*

3. Medplace is a Delaware corporation with its principal place of business in Phoenix, Arizona. *Id.*

4. NorthGauge provides healthcare consulting services, including peer review and early malpractice claims review services. ECF No. 137, Ex. A (hereinafter "Trial Tr."), 28:2-30:1.

5. Constellation operates within the medical professional liability insurance industry and is affiliated with other medical professional liability insurance companies, which provide insurance products to healthcare and long-term care clients. Trial Tr. 40:9-11; 490:9-25.

6. Constellation is a parent company to several subsidiaries. Trial Ex. 338. As relevant here, Constellation is the parent company to Constellation New Ventures, LLC

("CNV"). Trial Tr. 492:9-13. CNV is a holding company for new business ventures that Constellation creates. *Id.* at 492:14-17. CNV is the parent company for Medplace. *Id.* at 492:9-13; Trial Ex. 338. The idea behind Medplace began internally at Constellation through its Innovation Team working on "project Omega." Tr. Ex. 38.

7.  Medplace is a company that operates a digital platform performing numerous consulting services. Trial Tr. 704:16-705:9. One of the services Medplace provides is early claims review for healthcare clients, including for Constellation. Trial Tr. at 693:9-18.

8.  Medplace was incorporated after June 2019, during the effective term of the 2019 NDA entered into by NorthGauge and Constellation. *Id.* at 493:4-11; 671:19-24 ;Trial Ex. 70B.

### B.   The Professional Services Agreement

9.  The initial business relationship between NorthGauge and Constellation began when Jon Moses, NorthGauge's President and CEO, met Constellation's Chief Claims Officer, Nick Ghiselli, at a charity event. Trial Tr. 517:15-25. During their meeting, Mr. Ghiselli and Mr. Moses discussed ways that NorthGauge and Constellation could do business with one another. *Id.* at 43:14-44:5. The initial meeting resulted in additional meetings between NorthGauge and Constellation, including a NorthGauge presentation on or about April 18, 2016. Trial Ex. 241.

10. In May 2016, the parties entered into the Professional Services Agreement (the "PSA") for NorthGauge to assist with Constellation's Physician's Advisory Committee's ("PAC") performance of early claims review. Trial Ex. 70A; *see also* Trial Tr. 48:15-49:15; 511:9-517:20. The PSA listed NorthGauge's fees, and there was no evidence at trial that

anyone from NorthGauge ever told anyone at Constellation that the fees it charged or its fees schedule was confidential. Trial Tr. at 419:3-6; 519:11-520:1.

11. Early claims review is commonly used in the medical malpractice insurance industry. *Id.* at 908:6-16, 909:8-19; 910:11-20; 911:7-10. There are also third-party vendors that provide services essential for early claims review (i.e., medical record collection and organization). *Id.* at 924:1-927:15. The early claims review process is used to assess potential claims made by injured patients against medical providers. *Id.* at 908:17-909:7.

12. The PAC is part of Constellation's early claims review process, and it involves medical providers' assessments about whether proper standards of care were employed by Constellation's insured medical providers in the treatment of their patients. *Id.* at 515:22-516:17. Constellation had employed early claims review for at least forty years prior to executing the PSA with NorthGauge. *Id.* at 908:17-909:7.

13. Pursuant to the PSA, NorthGauge provided early claims review services to Constellation under Constellation's PAC approach. NorthGauge received medical records, assigned a reviewer, had a reviewer evaluate the case vis-à-vis the plaintiff's claims, and then the reviewer would appear remotely to join the PAC and present their findings and analysis of care. *Id.* at 52:19-25.

14. NorthGauge's early claims review process involved obtaining the requested and necessary information to perform a review in the case action request form, understanding the claim, matching the right physician with the requisite expertise to review the case, efficient organization of medical records so the physician could quickly locate the key elements of the medical record, all in preparation for easy and digestible delivery of the

case materials to the reviewer. Once the reviewer completed the case review, his/her findings were delivered in either a verbal or written report to Constellation to enable Constellation to effectively resolve a medical malpractice suit against its insured, and if needed, providing additional services as requested by the claims consultant. Trial Tr. at 76:17-79:18. This process was referred to at trial and is referred to herein as the "Early Claims Review Process."

15. In 2017, NorthGauge outlined to Constellation how it could assist Constellation's claims review process beyond the PAC, including by helping with (i) the details of the case review; (ii) how to pose case-specific questions to the reviewer; (iii) how the fee schedule is applied to the case at hand; and (iv) how to prepare and submit records. Trial Ex. 333.

16. At that time, Constellation was also using other methods for its early claims review process, including the use of defense attorneys or other vendors. Trial Tr. 53:9-17, 505:6-506:1.

17. Eventually, Constellation desired NorthGauge to have a more expansive role in Constellation's early claims review process. Trial Ex. 48. But during their entire business relationship, NorthGauge only performed ten to twenty percent of all of Constellation's claims reviews. Trial Tr. 507:7-18.

### C. NorthGauge and Constellation Collaborate on Early Claims Review

18. In the fall of 2018, NorthGauge and Constellation began collaborating on how to involve NorthGauge more in Constellation's claims review process. *Id.* NorthGauge's role and process for handling early claims review would evolve over time. *Id.* at 528:17-531:12. The evidence at trial demonstrated an iterative process in creating and refining

the claims review process, with both sides providing input, guidance, and advice. *See*, *e.g.,* Tr. Ex. 218, 219, 224, 225; Trial Tr. 56:1-7; 528:23-529:15.

19. In early 2019, Constellation requested that NorthGauge present its Early Claims Review Process to Constellation's board. *Id.* at 63:24-64:11.

20. On February 20, 2019, NorthGauge presented its Early Claims Review Process to Constellation's leadership. *Id.* at 80:1-20.

21. On March 20, 2019, NorthGauge once again presented its Early Claims Review Process to Constellation's board. Tr. Ex. 52, 223, 335. The slides from this presentation were later transmitted to Medplace's CEO, Jerod Bailey. Tr. Ex. 86.

22. In May 2019, Mr. Ghiselli met with Mr. Moses and other NorthGauge representatives at a charity event in Washington D.C. Trial Tr. 91:17-92:7; 536:24-537:12. During that Washington D.C. trip, which was primarily social in nature, Mr. Ghiselli and Mr. Moses began preliminary discussions about an expansion of the existing business relationship between NorthGauge and Constellation. *Id.* at 537:17-538:3. Mr. Ghiselli directed Mr. Moses to provide a business proposal for Constellation's evaluation. *Id.* Any NorthGauge proposal would be evaluated by Constellation's leadership team, and would have to be approved by Constellation's Board of Directors. *Id.* at 538:16-538:23. However, before any proposal was submitted, NorthGauge requested that a nondisclosure agreement be signed. Trial Ex. 70B.

### D.    The Mutual Non-Disclosure Agreement

23. On or about June 19, 2019, NorthGauge and Constellation entered into a Mutual Non-Disclosure Agreement (the "NDA"). *Id.*

24. The NDA's recitals state:

> **WHEREAS**, the Parties are considering <u>a potential commercial relationship or other business transaction</u> (the "<u>Opportunity</u>") and are entering into this [NDA] so they can share confidential information pertinent to the Opportunity with confidence that the other Party will use such confidential information only to evaluate the Opportunity and will not disclose that confidential information, except in accordance with the terms of this [NDA].

*Id.* (emphasis added)

25. Under the NDA, confidential information was broadly defined. *Id.* It included information such as "budgets," "projections" or "business strategies." *Id.* Pursuant to the NDA, "confidential information" could be shared "solely for the purpose of evaluating the Opportunity." *Id.* Additionally, "confidential information" could be disclosed to either party's "Representatives," if the material was used for evaluating the opportunity, and if the representative was informed of "this NDA" and agreed to "abide by the terms" of the NDA. *Id.*

26. The NDA defines a "Representative" as the "officers, directors, employees, partners, members, managers, agents, advisors (including without limitation, attorneys, accountants, consultants, bankers and financial advisors), subsidiaries or affiliates of a Party. *Id.* Medplace was not a subsidiary of Constellation on June 19, 2019, but it was incorporated during the term of the 2019 NDA. Trial Tr. 493:4-1, 671:19-24.

27. The NDA further states that confidential information excludes some information, including, but not limited to, information that (a) was in the public domain; (b) was properly known to the parties; or (c) was independently developed. Trial Ex. 70B.

28. The NDA permitted each side to "conduct any process for any transaction involving the Opportunity as they in their sole discretion" determine. *Id.* Further, "unless a definitive agreement" was entered, neither party was entitled to assert "any claims whatsoever" in regard to the Opportunity. *Id.*

29. At trial, NorthGauge's witnesses admitted that the Early Claims Review Process was already in operation under the PSA before discussions began about some future business "Opportunity." *See*, *e.g.,* Trial Tr. 199:9-200:25, 203:1-10, 205-6-11; 414:16-415:5; Trial Ex. 339.

### E.    NorthGauge's Disclosure of Business Information

30. On June 26, 2019, Mr. Moses sent Mr. Ghiselli and Constellation's Chief Executive Officer, Bill McDonough, a business proposal for combination (the "June 2019 Proposal"). Trial Ex. 39. The June 2019 Proposal included several subparts, including: (i) Request for Proposal for Business Combination; (ii) NorthGauge 10-Year Financial Projections; (iii) 2018 NorthGauge Income Statement; (iv) 2019 Year to Date Income Statement; (v) 2019 Year to Date Balance Sheet; (vi) NorthGauge Plan for Industry Impact; and (vii) NorthGauge Brochure. *Id.* The information contained in the June 2019 Proposal was referred to at trial and is referred to herein as the "Strategy and Financial Information."

31. At trial, NorthGauge established that the June 2019 Proposal was disseminated by Mr. Ghiselli to others within Constellation. Trial Ex. 9, 102, 106, 226. The recipients included Angela Griffith, John Woodward, and Megan Craig. *Id.*

32. The June 26, 2019, Proposal submitted by NorthGauge listed multiple options for proceeding forward, including (i) a strategic alliance with an exclusivity fee; (ii) a minority or majority investment; or (iii) a strategic acquisition of NorthGauge by Constellation. (Trial Ex. 39.) NorthGauge preferred option three (strategic acquisition) but left it in Constellation's hands to decide how to assign a value to NorthGauge. *Id.*

33. On July 8, 2019, Mr. Ghiselli emailed Mr. Moses, informing NorthGauge that negotiations for further business opportunities between NorthGauge and Constellation were on hold. Tr. Ex. 72; Trial Tr. at 456:10-459:10.

34. On July 9, 2019, Mr. Ghiselli met with Ms. Craig to discuss how the Innovation Team "could help the claims team with a case review platform." Trial Tr. at 460:2-16; Trial Ex. 8.

35. That same day, Ms. Craig sent Mr. Ghiselli a follow-up e-mail containing a slide deck presenting the Innovation Team's idea for a "platform" that would later become Medplace. The slide deck listed various options for partnering with NorthGauge and proceeding with NorthGauge. *Id.*; Trial Tr. at 463:25-467:17.

36. On July 19, 2019, Mr. Ghiselli sent NorthGauge's Strategy and Financial Information to the Innovation Team, stating it was "very confidential." Tr. Ex. 102; *see also* Trial Tr. at 447:7-25.

37. On August 1, 2019, at Constellation's request, Mr. Moses sent Constellation NorthGauge's Early Claims Review Process and a sample written physician peer review report. *See* Tr. Ex. 13. These materials were then disclosed to Constellation's Innovation Team. *Id.*

38. The negotiations between Constellation and NorthGauge stalled for some time in the second half of 2019, but were later restarted. Trial Tr. 546:15-18; 107:20-108:10.

39. On January 13, 2020, Mr. Moses emailed Mr. Ghiselli, continuing to make the case that there should be a further expansion of the NorthGauge and Constellation relationship. Trial Ex. 229. Additionally, Mr. Moses provided an update to the June 2019

Proposal (the "2020 Financial Update") to Mr. Ghiselli and Constellation's Chief Commercial Officer, Ms. Griffith. *Id*.

40. On January 22, 2020, Mr. Moses provided additional NorthGauge financial information, including: (i) 5-year revenue, expense, and net income trends; (ii) 5-year P & L by year; (iii) a balance sheet for the year ending 12/31/2019; and (iv) a balance sheet through January 22, 2020. *Id.*

41. At trial, NorthGauge established that Ms. Griffith shared the 2020 Financial Update with other Constellation employees, and that the 2020 Financial Update was later disclosed in August 2020 to Medplace's CEO Jerrod Bailey by those respective employees. Trial Ex. 85.

**F.  Constellation's Development of Medplace**

42. In June 2019, Constellation created an Innovation Team tasked with exploring ways to provide claims review services. *See* Tr. Ex. 38. The Innovation Team consisted of Constellation's employees Ms. Griffith, Ms. Craig, and Mr. Woodward. Trial Tr. 469:17-19.

43. On February 28, 2020, Constellation told NorthGauge that it was not interested in further exploring the opportunity for expanding their business relationship at that time. Trial Tr. 115:5-11.

44. In and around March 2020, the Innovation Team received funding from Constellation for the Omega project. *Id.* at 611:24-612:3

45. On July 13, 2020, Medplace hired Mr. Bailey as its Chief Executive Officer. Trial Tr. 679:23-680:4. Mr. Bailey came to Medplace with over two decades of working on internet-based start-up businesses. *Id.* at 696:9-702:13. He did not have any knowledge about the medical malpractice insurance industry. *Id.* at 704:16-20.

46. Upon commencement of his employment, Mr. Bailey began learning the medical malpractice insurance industry. Trial Tr. at 704:16-705:10. Mr. Bailey spoke to other insurance carriers, he spoke with Constellation's claims team, and he learned about Constellation's then existing claims process. *Id.; see also id.* at 98:23-99:6; Trial Ex. 317. He also learned about the different ways that claims review had occurred within Constellation, the pricing for services, and how claims review could be better accomplished. Trial Tr. 734:11-735:7.

47. Defendants' witnesses testified at trial that they did not use NorthGauge's financial information or process information in the development of Medplace. Mr. Bailey testified that in developing Medplace, none of NorthGauge's information or processes were relied upon and none were incorporated into the platform being developed. *Id.* at 712:1-9. Ms. Griffith testified that she did not direct anyone to "copy something" from NorthGauge. *Id.* at 644:10-17. And Ms. Craig testified that she did not update any of Medplace's financial projections based on information received from NorthGauge because she did not understand them. *Id.* at 1031:10-18, 1050:21-1051:3. Ms. Craig further stated that she never relied on the NorthGauge proposal for anything while developing Medplace. *Id.* at 1055:1-1055:4. Mr. Woodard testified that he did not recall using any of NorthGauge's June 2019 Proposal in the development of Medplace. ECF No. 138-9, Woodward Depo., 129:23-130:3, 201:18-203:5. Eric Becker, a former NorthGauge employee later retained as an independent contractor by Medplace, never discussed the process of case review with anyone at Constellation. ECF No. 138-10, Becker Depo. 73:6-10.

48. When NorthGauge's alleged confidential information was disclosed to Medplace or internally within Constellation, it was done so while Constellation was considering

expanding its existing business with NorthGauge, and the various options for expansion. *See*, *e.g.,* Trial Tr. 643:15-19, 32:16-733:5, 736:19-737:15. One PowerPoint presentation listed several options, including acquiring all or part of NorthGauge, investing in some portion of NorthGauge, creating a joint venture, making a strategic alliance, or proceeding without NorthGauge. Trial Ex. 11.

49. Mr. Bailey testified that, when he joined in 2020, a relationship with NorthGauge had value to Medplace. Trial Tr. 732:16-733:5. In his opinion, he was searching for a "win-win" arrangement between Medplace and NorthGauge. Trial Ex. 67. Those arrangements could have taken a variety of forms, including different types of partnership arrangements, such as NorthGauge using the Medplace platform to promote the business to others. Trial Tr. 737:20-738:2. Ms. Griffith testified that she did not view Medplace or NorthGauge as exclusive options. *Id.* at 647:10-18.

50. In November of 2020, Mr. Moses learned that Constellation developed Medplace. *Id.* at 116:13-14. He reviewed the Medplace website and claimed that there were "remarkable similarities" between Medplace and NorthGauge. *Id.* at 117:20-118:9. He also noticed that several of Medplace's founders were Constellation employees. *Id.* at 118:10-22.

51. At trial, NorthGauge witnesses, such as Mr. Moses, speculated that NorthGauge's alleged confidential information or trade secrets must have been used because of the contents from the original Medplace website that he reviewed in November of 2020. Trial Tr. 117:17-22. Dr. Rob Mordkin, NorthGauge's Chief Medical Officer, testified that he reviewed the Medplace website and that "he realized that many of the people" on the Medplace website "were in leadership positions" at Constellation. *Id.* at 329:16-330:17.

He did not, however, provide any other testimony about the content of the Medplace website and whether NorthGauge's information was published there. Julie Pemberton, a Senior Director at NorthGauge, testified that in her opinion, "there wasn't much on the [Medplace] website." *Id.* at 373:3-20.

52. The trial testimony shows that there are numerous aspects of NorthGauge's information that were never disclosed, at any time, to anyone at Constellation or Medplace. More specifically, NorthGauge's witnesses admitted that these important parts of its claims review process were never disclosed: (i) the NorthGauge physician compensation schedule (*Id.* at 142:24-143:14); (ii) the template reports provided to and filled out by NorthGauge's physician reviewers (*Id.* at 341:19-342:8); (iii) the NorthGauge internal project manual (*Id.* at 210:7-14, 410:13-420:2, Trial Ex. 305.1); and (iv) the NorthGauge internal project checklist. *Id.* at 211:1-4, 420:8-21; Trial Ex. 306. Before trial, the Court ruled at summary judgment that it was undisputed that NorthGauge never disclosed two other aspects of the claims review process: the Medical Record Bookmarking Guide for Adobe PDFs and the Project Information Form for Reviewers. ECF No. 63, p. 29.

53. Defendants' rebuttal liability expert, Mr. Timothy Smith, opined at trial about how early claims review is conducted at medical professional liability insurers and whether what NorthGauge asserted was its confidential claims review process was well-known in the industry. *See generally* Trial Tr. at 896:3-942:8. According to Mr. Smith, medical malpractice insurers employ early claims review so they can "understand early in the life cycle of the claim and/or litigation what is involved" and to make a decision about the direction of the litigation. *Id.* at 906:2-10.

54. Mr. Smith gave an opinion based on his review of NorthGauge's Early Claims Review Process (Trial Ex. 216A) and concluded that the NorthGauge process was generally well known in the industry. Trial Tr. 914:24-934:15. At trial, NorthGauge did not present any technical expert witness on the subject of the uniqueness of what NorthGauge claimed to be confidential or a trade secret. NorthGauge also did not present any testimony to support the concept that any of its process or financial information was valuable from not being generally known.

55. After learning of Medplace's existence, NorthGauge suspended its services to Constellation. The suspension of services occurred in the midst of several ongoing early claims reviews within Constellation's claims department. *Id.* at 560:13-561:12. As a result of NorthGauge's suspension of services, Constellation turned to Medplace, which then had to incur several costs ahead of schedule, including physician recruitment expenditures, software development costs, and other operational expenses. Trial Tr. 733:6-17.

56. Mr. Ghiselli testified that if NorthGauge had not suspended its services to Constellation, NorthGauge would have remained as an early claims review vendor. *Id.*

57. Medplace was announced to the medical malpractice insurance marketplace in the third or fourth quarter of 2021. *Id.* at 692:11-693:3. Since December 2020, Medplace had assisted Constellation with its early claims review process. *Id.* at 693:4-8. It was a start-up company with no track record of sales, and as Mr. Bailey explained, there were significant start-up costs. As a start-up, internet-based platform company, Medplace had to invest from the very beginning in personnel and technology efforts to design and build and market its new business. Among the costs were items relating to software

development, marketing and sales, and clinical operations. *Id.* at 741:23-742:22, 841:3-843:8, 845:18-847:23, 850:3-20.

### G.    Medplace Revenues

58. At trial, NorthGauge's damages expert, David Haas, testified that NorthGauge's trade secrets were "overlapping", "intertwined", and that it was not "practical to separately quantify" the trade secrets in this case. Trial Tr. 786:11-787:3. As a result, he did not assign a value to any particular claimed trade secret or any particular confidential information. *Id.* 798:10-799:2. Rather, he assigned only one value to all of the trade secrets and confidential information, including NorthGauge's financial information. *Id.* at 803:22-804:11.

59. Mr. Haas opined that, assuming that all of NorthGauge's claimed trade secret and confidential information was used by Medplace to gain revenue from Constellation, NorthGauge was entitled to $3,052,762 in monetary damages based on his "disgorgement of profits" analysis. Trial Ex. 422; Trial Tr. 788:17-789:3.

60. In response to Mr. Haas's opinions, Defendants presented the rebuttal testimony of Shirley Webster. Ms. Webster explained that over ninety percent of Medplace's revenues derived from its services for Constellation. Trial Tr. 865:24-866:3. She also opined that Mr. Hass's opinions did not allocate or apportion any of the revenues that might have been attributable to Medlace's own work or their own information. *Id.* at 852:2-853:25; Trial Ex. 441.

61. NorthGauge claims $5.1 million dollars in unjust revenues, from which Mr. Haas subtracted only $2.0 million in related expenses, for a total profit margin to be disgorged of ~$3.1 million. Trial Ex. 422.

62. Ms. Webster calculated essentially the same Medplace revenues ($5.1 million), but she calculated that it cost Medplace $5.30 million to generate that revenue, resulting in Medplace losing money throughout that same time period. Trial Ex. 441.

63. Taking into account all of the expenses incurred, Medplace has not made any net profits in 2020-2023. Trial Ex. 441; Trial Tr. 726:20-727:8. Instead, it has had to rely on additional capital infusions from its parent company, Constellation. Trial Tr. 727:9-11.

## II.    CONCLUSIONS OF LAW

To prevail on an unjust enrichment claim, a party must prove that "(1) the defendant received a benefit (2) at plaintiff's expense (3) under circumstances that would make it unjust for the defendant to retain the benefit without commensurate compensation." *DBC Const. Co., Inc. v. Central City Development Co.,* 965 P.2d 115, 119 (Colo. 1998). "If the elements of unjust enrichment are proved, the defendant who received the benefit is normally required to make restitution to the plaintiff in the amount of the enrichment the defendant received."  *Harris Grp., Inc. v. Robinson*, 209 P.3d 1188, 1205 (Colo. App. 2009). One remedy for unjust enrichment can be a disgorgement of profits "unjustly" obtained by the defendant. *Rocky Mountain Nat. Gas, LLC v. Colo. Mountain Junior College Dist.*, 385 P.3d 848, 855 (Colo. App. 2014) (citing *EarthInfo, Inc. v. Hydrosphere Res. Consultants, Inc.*, 900 P.2d 113, 118 (Colo. 1995)).

NorthGauge contends Medplace benefited from NorthGauge's alleged confidential information and trade secrets. The alleged confidential information and trade secrets consists of NorthGauge's Strategy and Financial Information, details of NorthGauge's Early Claims Review Process, and various other documents and information of NorthGauge's. As a result of Medplace's alleged unjust enrichment, NorthGauge seeks

a disgorgement of Medplace's profits from Constellation revenue in the amount of $3,052,762.

Based on the record taken as a whole, the Court finds that NorthGauge's unjust enrichment claim fails for two reasons. First, NorthGauge failed to show how Medplace benefited from NorthGauge's alleged confidential information and trade secrets at NorthGauge's expense. And second, NorthGauge failed to show that there are unjust circumstances present that would entitle NorthGauge to disgorgement of Medplace's profits.

### A.      Whether Medplace Received a Benefit at NorthGauge's Expense.

In the unjust enrichment context, a benefit "may be anything that adds to another's security or advantage." *Indian Mountain Corp. v. Indian Mountain Metro. Dist*., 412 P.3d 881, 888 (Colo. App. 2016) (citing *Cablevision of Breckenridge, Inc. v. Tannhauser Condo. Ass'n*, 649 P.2d 1093, 1097 (Colo. 1982)); *see also* Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. d (Am. Law Inst. 2011) ("Restitution is concerned with the receipt of benefits that yield a measurable increase in the recipient's wealth."). It is undisputed that NorthGauge shared its Strategy and Financial Information and Early Claims Review Process with Constellation (who then shared it with Medplace) during the parties' business relationship and as part of the parties' discussions toward expanding that relationship. However, NorthGauge failed to show how Medplace benefited from this information at NorthGauge's expense.

First, the Court finds that at least some aspects of NorthGauge's Early Claims Review Process were generally known in the industry. The evidence at trial showed that claims review is generally performed in the medical professional liability insurance

industry (Trial Tr. 914:24-934:15), and that Constellation performed early claims review for decades prior to working with NorthGauge. *Id.* at 506:15-25. There was also considerable evidence that Constellation and NorthGauge collaborated on certain aspects of the Early Claims Review Process. *Id.* at 28:23-529:15; Trial. Ex. 218, 219, 224, 225. At trial, NorthGauge could not show how generally known information was valuable to it. NorthGauge also could not show that Medplace created its platform exclusively using information from NorthGauge's Early Claims Review Process and not from Constellation's own experience with early claims review and information generally known in the industry. Accordingly, the Court does not find that Medplace benefited from the generally known information at NorthGauge's expense.

Next, to the extent NorthGauge shared information that was not generally known in the industry, NorthGauge was unable to show how Medplace benefited from that information. Based primarily on the appearance of the Medplace website in November 2020, NorthGauge assumed that because Medplace had access to certain information of NorthGauge's, it must have used it in the development of its platform. But NorthGauge provided no specifics other than that some of Constellation's executives were on the website and it appeared Medplace was offering some of the same services as NorthGauge. While the timing and appearance of the Medplace website may have been suspect to NorthGauge, its mere suspicion and speculation is not enough to satisfy its burden. There was no testimony or evidence demonstrating how the appearance of the website proves Medplace used and benefited from NorthGauge's information. Indeed, NorthGauge never put the Medplace website or its contents into evidence. The Defendants' witnesses repeatedly testified that they did not incorporate any information

from NorthGauge or rely on any information from NorthGauge when developing Medplace. *Id.* at 644:10-17, 655:9-17, 657:12-658:8. Mr. Bailey testified that he could not tell from the NorthGauge annual reports anything about what NorthGauge was paying its reviewers. *Id.* at 430:13-432:8, 753:6-754:6. And there was no testimony or evidence linking anything in NorthGauge's Strategy and Financial Information to any feature, pricing, design, strategy, or development of the Medplace internet platform. Absent any evidence of how NorthGauge's information was used by Medplace, the Court cannot find that Medplace benefited from the information at NorthGauge's expense.

Finally, NorthGauge did not disclose all aspects of its Early Claims Review Process to the Defendants. Several of NorthGauge's representatives admitted at trial that integral parts of the Early Claims Review Process were never disclosed to Defendants, including: (i) the physician compensation schedule (Trial Tr. 142:24-143:14); (ii) the template reports for the physician reviewers (*Id.* at 341:19-342:8); (iii) the NorthGauge internal project manual (*Id.* at 210:7-14, 419:13-420:2; Trial Ex. 305.1); and (iv) the internal NorthGauge project checklist. (Trial Tr. 211:1-4, 420:8-21; Trial Ex. 306.) Prior to trial, the Court ruled that NorthGauge also never disclosed two other aspects of its review process: the Medical Record Bookmarking Guide for Adobe PDFs and the Project Information Form for Reviewers. ECF No. 63, at 29. Medplace could not have benefited from information it never possessed.

Because NorthGauge did not prove that it conferred a benefit on Medplace at NorthGauge's expense, NorthGauge cannot prevail on its equitable claim for unjust enrichment.

**B.      Whether There Are Unjust Circumstances That Require Payment to NorthGauge.**

Whether unjust circumstances exist requires "a fact-intensive inquiry in which courts look to, among other things, the intentions, expectations, and behavior of the parties." *Melat, Pressman & Higbie, L.L.P. v. Hannon Law Firm*, 287 P.3d 842, 847 (Colo. 2012). Based on the record as a whole, the Court is not persuaded that there are unjust circumstances requiring payment from Medplace to NorthGauge. Thus, NorthGauge has also failed to satisfy this element of its unjust enrichment claim.

Under the June 2019 NDA, the parties were free to share "Confidential Information" for the purpose of "evaluating the Opportunity." Trial Ex. 70B. The "Opportunity" meant a "potential commercial relationship" between NorthGauge and Constellation. Trial Tr. 97:12-23. The parties entitled to review 'Confidential Information" in furtherance of the "Opportunity" included the "officers, directors, and employees" of any "subsidiaries or affiliates of a Party." Trial Ex. 70B. Nothing in the NDA prohibited the parties from conducting a competing business. *See id.* ("[T]he Parties acknowledge that they may conduct competing businesses and nothing in this Agreement shall restrict or prohibit either Party from continuing to conduct its business and to compete with the other Party so long as such action does not violate the terms of this Agreement.").

The evidence at trial showed that Constellation shared NorthGauge's Strategy and Financial Information with Medplace to evaluate various potential scenarios to move forward with NorthGauge, i.e., the "Opportunity". Trial Tr. 611:1-9, 642:13-643:3, 646:25-646:6, 654:4-10, 657:220658:6, 669:23-670:20, 732:12-733:5. This included potential scenarios for Constellation to purchase NorthGauge, or to explore a contractual partnership between Medplace and NorthGauge. *Id.* at 736:19-738:7; Trial Ex. 8, 11. The

evidence showed at least six different options about how to proceed with NorthGauge. Trial Ex. 11. These options also included NorthGauge potentially assisting in the build out of the Medplace technology. Trial Tr. 748:18-22. In July of 2020, Mr. Bailey was open to a "win-win" scenario where NorthGauge could work directly with the Medplace platform. *See*, *e.g.,* Trial Ex. 217; Trial Tr. 732:11-24. Thus, based on the evidence at trial, the uses and disclosures made by Constellation (including the information shared with Mr. Bailey in 2020) were within permissible grounds under the NDA.

The Court concludes that NorthGauge's claim for unjust enrichment is not supported by the weight of the evidence. By the terms of the 2019 NDA, Constellation was permitted to make internal disclosures and internal uses of NorthGauge information as it evaluated the "Opportunity" over time. There is no indication that by developing Medplace, Constellation had any intention to stop working with NorthGauge. To the contrary, the Medplace Powerpoint presentations indicate that Medplace was actively considering ways to partner with or incorporate NorthGauge's services into its platform. But NorthGauge suspended its services before any further collaboration could occur. Left without NorthGauge's services, Constellation turned to Medplace, who then incurred costs ahead of schedule in order to properly service Constellation. The Court does not find that, under these circumstances, equity requires disgorgement of Medplace's alleged net profits.

And even if the Court were to find some equitable grounds favoring NorthGauge, the evidence presented at trial is insufficient to place a value on the alleged benefit to Medplace. Here, NorthGauge's damages expert, Mr. Haas, offered a single measure of damages—disgorgement of Medplace's profits from Constellation revenues. Mr. Haas's

measure of damages is based on the assumption that <u>all</u> of Medplace's profits stemmed from the use of <u>all</u> of NorthGauge's alleged trade secrets and confidential information. This damages theory is similar to the theory employed by the plaintiff in *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1076 (N.D. Cal. 2005). In *O2*, the plaintiff's damages expert testified that the theft of eleven trade secrets unjustly enriched the defendant by $16 million. *Id.* The jury found that the misappropriation of only one trade secret resulted in the defendant being unjustly enriched and awarded $12 million in damages. *Id.* The district court recognized that damages must be calculated flexibly but struck the expert's testimony because it no longer provided a "reasonable basis" to support a jury award. *Id.* Because the jury had been "left without sufficient evidence, or a reasonable basis, to determine the unjust enrichment damages ... the jury's award of unjust enrichment damages was based on speculation and guesswork, not on evidence." *Id.* at 1077. On this basis, the court granted the defendant's motion for judgment as a matter of law. *Id.*

The Court applies the same rationale here. Under NorthGauge's damages theory, if the trier of fact finds that any less than all of NorthGauge's alleged trade secrets and confidential information resulted in Medplace's unjust enrichment, the trier of fact would have no basis to calculate the fair value of NorthGauge's loss. As described above, the Court has found that many of NorthGauge's alleged trade secrets and confidential information could not have been used to unjustly enrich Medplace—because they were never disclosed to Medplace, were commonly known in the industry, and/or were co-developed with Constellation. Thus, even if the Court were to find (which it does not) that some of NorthGauge's information unjustly enriched Medplace, it would have no way to

determine the value of such information because Mr. Haas employed an all-or-nothing damages approach. *See, e.g., Pomeranz v. McDonald's Corp.*, 843 P.2d 1378, 1382-84 (Colo. 1993) (there must be "sufficient admissible evidence which would enable the trier of fact to compute a fair approximation of the loss"); *Graphic Directions, Inc. v. Bush*, 862 P.2d 1020, 1024 (Colo. App. 1993) (stating monetary damages cannot "be based on speculation or conjecture."); *W. Cities Broad., Inc., v. Schueller*, 849 P.2d 1993 (Colo. 1993) (en banc) (stating certainty "requires a reasonable degree of persuasiveness in the proof of the fact or damages or injury.").

For these reasons, NorthGauge's claim for unjust enrichment against Medplace is denied.

## II.    CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Pursuant to and in accordance with the jury's special verdict form responses, Judgment is entered in favor of Defendants and against Plaintiff on Plaintiff's claims for misappropriation of trade secrets under the Defend Trade Secrets Act and the Colorado Uniform Trade Secrets Act.

2.    Judgment is entered in favor of Constellation on Plaintiff's breach of contract claim for breach of the NDA.

3.    Judgment is entered in favor of Medplace on Plaintiff's unjust enrichment claim.

4.    Plaintiff's claim for breach of the PSA against Constellation is dismissed with prejudice.

5.    The Clerk of Court is directed to enter Final Judgment in this matter in accordance with this Order.

6.    The Court has set a briefing schedule for remaining post-trial matters at ECF No. 133.

DATED:  April 25, 2024

BY THE COURT:

_____

REGINA M. RODRIGUEZ
United States District Judge